Below is an Opinion of the Court.

_____
TRISH M. BROWN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re:<br><br>FRANK F. HARTNER,<br><br>         Debtor.<br>KENNETH S. EILER,<br><br>         Plaintiff,<br><br>  v.<br><br>JENNIFER C. HARTNER,<br><br>         Defendant. | Bankruptcy Case<br>No. 16-31394-tmb7<br><br><br><br>Adv. Proc. No. 17-3112-tmb<br><br>OPINION |

There are two matters before the court concerning Claim No. 2-3 (the "Claim"), filed by creditor Jennifer Hartner on August 30, 2017, in the above-captioned case. The Claim, as amended, seeks $405,631.47, which represents one-half of the Debtor's share of the proceeds from two parcels of real property that were liquidated by trustee Kenneth Eiler ("Trustee").[1] The Trustee and creditors

---

[1] The Claim, as drafted, is somewhat more complicated. Exhibit A to the Claim states that Ms. Hartner is entitled to $499,237.48, and that she had already received payment of $93,606.01. This latter

Page 1 – OPINION

Marcus and Matthew Fullard-Leo have both raised various objections to certain aspects of Ms. Hartner's Claim. The court held a hearing on these matters on December 6, 2017, at which evidence was received. Ms. Hartner was represented by Douglas R. Ricks, the Fullard-Leos were represented by Kenneth P. Childs, and the Trustee was represented by Brad T. Summers.

I have closely reviewed the evidence and arguments presented at the December 6 hearing, and have reviewed all of the parties' relevant filings in the above-captioned main case and adversary proceeding, including the contents of the Claim, Ms. Hartner's response to the Fullard-Leos' claim objection (Main Case ECF No. 319), Ms. Hartner's Supplemental Memorandum in Support of Motion for Relief from Stay (Main Case ECF No. 320), the Fullard-Leos' memorandum in support of their objection to the Claim (Main Case ECF No. 376), the Trustee's Memorandum in Support of Motion for Summary Judgment ("MSJ," AP ECF No. 6), the Trustee's Concise Statement of Material Facts ("CSF," AP ECF No. 7), and Ms. Hartner's responses to the MSJ ("Def. Resp.," AP ECF No. 26) and the CSF ("Def. Resp. to CSF," AP ECF No. 27). In addition, I have reviewed relevant legal authorities, both as cited to me by the parties and as located through my own research.

There are three competing views of the Claim. First, Ms. Hartner argues that her half of the sales proceeds are her own property, not property of the bankruptcy estate. Under this approach, Ms. Hartner would receive full payment of the asserted amount of her Claim. The second position, taken by the Trustee, is that Ms. Hartner holds a valid claim, but she should be paid on the same terms as all other allowed unsecured claims in this case.[2] Finally, the Fullard-Leos argue that the Claim should be disallowed in full. Because the legal issues raised by the Trustee and the Fullard-Leos are heavily

---

amount represents proceeds from the sale of a third property, 436 N. Main Street, Gresham, Oregon. Ms. Hartner was a co-owner of that property, and her entitlement to a portion of the sales proceeds was established via a judgment issued pursuant to 11 U.S.C. § 363(h), in Adversary Proceeding 16-3098-tmb. That matter is *res judicata* and not disputed. Accordingly, any references in this ruling to "the Claim" refer to the $405,631.47 that Ms. Hartner still seeks to recover.

[2] At this time, the Trustee predicts that unsecured creditors will recover less than 100% of their claims. *See* Trustee's Rpt. Re Matters Heard on Dec. 6, 2017 (Main Case ECF No. 382).

Page 2 – OPINION

intertwined and based on a common nucleus of material facts, I will address the issues in one consolidated ruling. This opinion states the court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a) (applicable through Federal Rules of Bankruptcy Procedure 7052 and 9014(c)). After carefully weighing the facts underlying this dispute, and considering applicable law, I conclude that Ms. Hartner's Claim is time-barred.

## I. Relevant Facts

Frank Hartner ("Debtor") and Jennifer Hartner are former spouses. As part of their marital dissolution, Debtor and Ms. Hartner executed a Marital Settlement Agreement in October 1992 (the "MSA," Claim, Exh. B, at 6-32). The MSA was incorporated by reference into a Stipulated Judgment of Dissolution of Marriage (the "Judgment," Claim, Exh. B at 1-5), which was entered on the judgment register of the Multnomah County Circuit Court on October 15, 1992.

Among other things, the MSA identifies two pieces of real property that were relevant to the division of the couple's assets: (1) "real property commonly known as 'Franz Building' located in Gresham, Oregon" ("Franz Property"),[3] and (2) property located at 31265 SE Highway 26, in Boring, Oregon ("Ashely's Village Property"). At the time of the dissolution, the Franz Property and the Ashley's Village Property (collectively the "Subject Properties") were owned by Ashley's, Inc. and Can American, Inc.,[4] respectively (collectively, the "Corporate Entities"). The Corporate Entities were business entities controlled by Debtor and his brother.

The MSA grants Debtor all of the couple's right, title, and interest in the Corporate Entities; however, it also sets forth a procedure under which Ms. Hartner could have obtained a supplemental judgment equal to half the value of specific corporate-held assets, including the Subject Properties.

---

[3] Although the MSA does not contain any legal description or address of the Franz Property, the parties agree that it refers to the property that the Trustee sold on March 29, 2017. *See* CSF ¶¶ 6-7.

[4] The MSA itself refers to "Can America, Inc.," although all other evidence in the record indicates that the name of the entity is actually "Can American, Inc."

Page 3 – OPINION

MSA ¶ 9(a). That procedure was to begin with a mutually-agreed valuation process, and culminate in the entry of a stipulated money judgment equal to 50% of the fair market value of the relevant corporate assets.[5] MSA ¶ 9(a)(i) through (iii). The MSA further provides that if Debtor "sells or refinances" any of the corporate-held assets before his payment obligation is reduced to judgment, Ms. Hartner is entitled to 50% of Debtor's share of the net proceeds. *Id.* ¶ 9(a)(iv). Debtor and Ms. Hartner never completed the valuation process described in paragraph 9(a) of the MSA, and a supplemental judgment was never entered. Def. Resp. to CSF ¶ 10.

On April 12, 2016, Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code, and Mr. Eiler was appointed as trustee of the bankruptcy estate. On September 8, 2016, Trustee filed a notice of intent to sell the Franz Property. CSF ¶ 6. The sale closed on March 29, 2017, and after payment of encumbrances and costs of sale, the bankruptcy estate received proceeds of $708,341.19. *Id.* ¶ 7. On November 29, 2016, Trustee filed a notice of intent to sell the Ashley's Village Property. Main Case ECF No. 151. The court entered an order approving the sale on January 17, 2017. CSF ¶ 4. The sale closed on May 1, 2017, and the bankruptcy estate received proceeds of $128,306.20. *Id.* ¶ 5.

On August 16, 2016, Ms. Hartner filed a precautionary proof of claim, stating that she was owed an unknown amount on account of the MSA. Claim No. 2-1. This claim was subsequently amended twice, and now Ms. Hartner seeks payment of $405,631.47, which represents one half of Debtor's share of the sales proceeds from the Subject Properties, without accounting for related tax liabilities.[6]

---

[5] According to the MSA, the only assets of the Corporate Entities other than the Subject Properties were two businesses. The parties have not produced evidence or argument concerning these other assets and this ruling is limited to the disposition of the proceeds from the sale of the Subject Properties.

[6] One important ambiguity that the parties did not address is that the MSA allows Ms. Hartner to recover a percentage of "net proceeds," but the contract does not define this term. The Trustee's sale

Page 4 – OPINION

## II. Jurisdiction

I have jurisdiction to decide the adversary proceeding initiated by the Trustee and the Fullard-Leos' claim objection under 28 U.S.C. §§ 1334 and 157(b)(2)(B) and (K).

## III. Analysis

A. <u>Does Ms. Hartner Have an Ownership Interest in the Corporate Entities</u>?

In the Claim, Ms. Hartner asserts that she was, on the petition date, "the holder of a 25% ownership interest in the Debtor's interest in Can-American, Inc., and El Nino, LLC and Ashley's, Inc." Claim, Exh. A. Ms. Hartner appears to have subsequently abandoned this argument, but to remove any doubt, I will conclusively dispose of this theory. The MSA unambiguously awards Debtor "all right, title and interest" in Can American, Inc. and Ashley's, Inc. MSA ¶ 9(a). There is no evidence in the record indicating that Ms. Hartner reacquired these corporate interests, or that she ever owned an interest in El Nino, LLC.[7] Accordingly, I find that on the petition date, Ms. Hartner had no ownership interest in the Corporate Entities or El Nino, and that argument in support of the Claim fails.

B. <u>Were Debtor's Interests in the Corporate Entities Held in Trust for Ms. Hartner</u>?

Ms. Hartner advances a variety of arguments based on the theory that under the MSA, Debtor held his interests in the Corporate Entities in trust for the benefit of Ms. Hartner, and therefore the

---

of the Subject Properties generated substantial capital gains tax liability. *See* Trustee's Rpt. re Matters Heard on Dec. 6, 2017 (Main Case ECF No. 382). The term "net" refers to amounts "remaining after the deduction of *all charges*, outlay, or loss." *Westar Electric Co. v. Westar Acquisition Corp.*, 177 Or. App. 174, 182 (2001) (quoting *Webster's Third New Int'l Dict.* at 1519) (emphasis added, internal quotation marks omitted). It is therefore possible that Ms. Hartner's Claim should be calculated as half of the sales proceeds *after* deducting associated taxes; however, because of my ultimate ruling that the Claim is time-barred, I need not resolve this computational ambiguity.

[7] The Franz Property was transferred from Ashley's Inc. to El Nino, LLC in 1998. *See infra*, § III(C)(3). The Trustee—acting as the holder of Debtor's and Debtor's brother's interests in the LLC—took control of El Nino in 2016 for purposes of managing and liquidating the Franz Property. *See* Main Case ECF 91.

Page 5 – OPINION

proceeds are not property of the estate.[8] I am not persuaded by any of these theories.

1. Express Trust

To begin, Ms. Hartner contends that the MSA "is sufficient to create an express trust under Oregon law." Def. Resp., at 9. I disagree. As relevant here, the creation of an express trust under Oregon law requires either a transfer of property to a trustee, a declaration by the trustee that certain property is held in trust, or a court order that "requires property to be administered in the manner of an express trust." ORS 130.150(1).[9] None of these requirements are met.

The critical element required to create an express trust is a manifestation by the settlor of an intent to create a trust relationship. Restatement (Third) of Trusts § 13 (2003). Such manifestation "requires an external expression of intention" and must include the intent "to impose enforceable duties." *Id.*, cmt. a. The MSA does not say that Debtor holds his interests in the Corporate Entities in trust for Ms. Hartner. It is true, as Ms. Hartner argues, that the use of the term "trust" or "trustee" is not strictly required to create a trust; nonetheless, the contextual evidence in the MSA clearly indicates to me that there was no external expression of intent to create a trust. I make this finding based on three specific features of the MSA. First, instead of transferring the corporate interests to Debtor "in trust," the MSA awards Debtor "all right, title and interest in said corporations, subject to judgment

---

[8] Ms. Hartner makes a strained argument that the MSA establishes different ownership regimes for the Corporate Entities versus the potential proceeds from the sale of the Subject Assets. *See* Def. Resp., at 9-11. This reading is not supported by the text of the MSA. The MSA either grants Ms. Hartner a claim secured by a lien on Debtor's interests in the Corporate Entities, or it anticipates that she will receive such a secured claim in the future, following a valuation procedure. *See infra*, note 10. Given this starting point, it is logical that whatever rights Ms. Hartner has vis-à-vis the interests in the Corporate Entities would also apply to any proceeds that resulted from a sale of the underlying assets. This does not, as Ms. Hartner would have the court rule, create some kind of bifurcated ownership structure. Rather, it is simply the standard mechanics of a security interest.

[9] Admittedly, ORS 130.150 is part of Oregon's enactment of the Uniform Trust Code ("UTC"), which did not exist in 1992 when the MSA was executed. Nonetheless, the statute is relevant to this analysis because Oregon's UTC states that it applies to trusts created before the statutory enactment. ORS 130.910(1)(a). In addition, as relevant here, the UTC is generally a codification of common-law principles that would have governed the creation of an Oregon trust at the time the MSA was executed.

Page 6 – OPINION

liens in favor of [Ms. Hartner]." MSA ¶ 9(a). While this language does create some interpretational problems,[10] it is clear in one respect: the intent of the MSA is to create a garden-variety debtor-creditor relationship as opposed to a trustee-beneficiary relationship.

Second, the MSA states that Debtor "has a duty to manage the business assets [of the Corporate Entities] and to maintain them in their current or better condition. Husband shall use his best efforts to make the businesses profitable." MSA ¶ 9(b). This duty is less extensive than, and clearly distinguishable from, the fiduciary duties imposed on a trustee. *See* ORS 130.650 through 130.710 (defining a trustee's duties). Debtor and Ms. Hartner were represented by counsel in their divorce (*see* Judgment at 5), and those lawyers would have known the difference between a trustee's fiduciary duties and the more relaxed duties imposed on Debtor under the MSA.

Finally, another provision of the MSA does provide for a trust in relation with certain life insurance proceeds. MSA ¶ 12(c). This indicates that the drafters of the MSA understood the significance of a trust, and deliberately chose not to create a trust for purposes of holding the interests in the Corporate Entities.

For the above reasons, the MSA's disposition of Debtor's and Ms. Hartner's interest in the Corporate Entities uses standards and procedures that are fundamentally inconsistent with the creation of a trust. I therefore conclude that the Debtor did not hold his interests in the Corporate Entities as the trustee of an express trust.

///

///

---

[10] I find the Judgment's reference to "judgment liens" to be confusing. It is unclear to me whether the Judgment actually sought to contemporaneously create a lien on Debtor's interests in the Corporate Entities, or whether it simply vested those interests in Debtor subject to Ms. Hartner's ability to obtain a lien through a supplemental judgment. Ultimately this distinction is of little practical import here. If the latter is true, then Ms. Hartner's claim to the proceeds has been unsecured from the beginning. If the former is true, then Ms. Hartner's security interest can be avoided by the Trustee, leading to the same result. *See infra*, § III(C)(1).

2. Resulting Trust

Ms. Hartner argues, in the alternative, that Debtor held the interests in the Corporate Entities in a resulting trust, pursuant to ORS 107.105(3), which provides that upon entry of a property-division judgment, the transfer of property is "deemed effective for all purposes" and the judgment "shall affect . . . commonly owned property in the same manner as would a declaration of a resulting trust in favor of the spouse to whom the property is awarded." This argument is unpersuasive because ORS 107.105(3) provides for a resulting trust to benefit a party who is supposed to be the *transferee* under a property-division judgment. Here, the Judgment did not order any interest in the Corporate Entities transferred to Ms. Hartner; rather, the opposite is true: the interests were transferred to Debtor. Although the MSA clearly provided Ms. Hartner with the ability to obtain a *future* transfer of property (by creating a process whereby she could obtain a supplemental judgment that would attach to the certain of Debtor's assets[11]), it did not itself order the transfer. Ms. Hartner argues that the MSA did order a transfer of 50% of future proceeds, but again, this is a strained reading of the contract. The MSA simply created a procedure for future transfers of property. If, as Ms. Hartner argues, the MSA had the effect of contemporaneously transferring half of Debtor's interest in the Corporate Entities and the sales proceeds, then the reference to a future stipulated judgment would make no sense: Debtor would have already transferred one-half of his interest, and would have no ability to stipulate to a future transfer of that same interest.

3. Constructive Trust

Finally, Ms. Hartner argues that her "entitlement of a 50% share of the sale proceeds would also be established by virtue of a constructive trust against the assets of Can-Am and El Nino." Def. Resp., at 11. I conclude that this argument fails under applicable Oregon law. A constructive trust is a

---

[11] For purposes of this discussion, I consider the creation of a judgment lien to be a transfer. *See, e.g.*, 11 U.S.C. § 101(54)(A); ORS 95.200(12).

Page 8 – OPINION

remedy that arises "where a person in a fiduciary or confidential relationship acquires or retains property in violation of his duty to the grantor." *Albino v. Albino*, 279 Or. 537, 550 (1977). I have already found that Debtor was not acting as a fiduciary, and after examining Oregon case law, I also find that Debtor and Ms. Hartner were not in a "confidential relationship" at the time the Judgment was entered.

A "confidential relationship must be one upon which the grantor justifiably can and does rely." *Albino*, 279 Or. at 550. Notably, the *Albino* court held that a close family relationship "is not intrinsically one of confidence, but under certain circumstances involves a confidence the abuse of which gives rise to a constructive trust." *Id.* Here, the MSA itself provides evidence sufficient to show that Ms. Hartner would not be justified in relying on Debtor to uphold the duties he owed to her. First, and most obviously, upon entry of the Judgment, Debtor and Ms. Hartner were no longer close family members, they were former spouses. *See* MSA, at 1 ("[T]he parties are presently, and have been for some time, living apart and separate because of irreconcilable differences existing between the parties which make the continuation of the marriage impossible."). Even so, if there were a high degree of justifiable reliance between the former spouses, then presumably Ms. Hartner would have simply relied on Debtor's covenant to pay her the money to which she was entitled. Instead, the MSA provides Ms. Hartner with the ability to obtain a supplemental judgment and the coercive powers that go along with such a remedy. This contractual feature indicates that there was not the level of trust required to form a confidential relationship.[12] Without a fiduciary or confidential relationship, there can be no constructive trust.

---

[12] The very fact that Debtor obtained the couple's interests in the Corporate Entities by means of the MSA (which is a contract), leads me to wonder if the remedy of a constructive trust is unavailable to Ms. Hartner as a matter of law. *See* Restatement (Third) of Restitution and Unjust Enrichment § 55, cmt. f (2011) ("Constructive trust is not a remedy for nonfraudulent breach of contract.").

Page 9 – OPINION

C. <u>Does Ms. Hartner Hold an Allowed Claim</u>?

Ms. Hartner has advanced various arguments contending that her share of the sales proceeds was not property of the estate. The preceding discussion explains why I do not find those theories meritorious. However, just because the proceeds are property of the bankruptcy estate does not end the analysis. The parties still dispute whether Ms. Hartner has a secured or unsecured claim.

1. <u>Does Ms. Hartner Have an Enforceable Security Interest in the Sales Proceeds</u>?

The Claim states that Ms. Hartner has a judgment lien on the proceeds arising from the sale of the Subject Properties. Although this argument is not developed in Ms. Hartner's subsequent filings, it is worthy of consideration.

At the time the Judgement was docketed in the Oregon circuit court, it created "a lien upon all the real property of the judgment debtor within the county where the [judgment] is docketed." ORS 18.350(1) (1991); *accord* ORS 18.150(2) (2015) (similar provision in current law). For purposes of this statute, Debtor is the judgment debtor under the Judgment. The Subject Properties were owned by the Corporate Entities, not by Debtor; therefore, any judgment lien would not have attached to the Subject Properties themselves. To the extent that the Judgment created a lien on Debtor's interests in the Corporate Entities and/or the sales proceeds, that collateral is personal property. Ms. Hartner has produced no evidence suggesting that she perfected the Judgment as to personal property, and any purported lien on the proceeds is thus avoidable by the Trustee under 11 U.S.C. § 544(a)(1).[13]

2. <u>Does Ms. Hartner Have an Unsecured Claim Under the Judgment</u>?

The Judgment undisputedly provides for certain remedies in favor of Ms. Hartner. Thus, the next logical question is whether she may use the Judgment as the basis for the Claim. The Fullard-

---

[13] Although Ms. Hartner criticizes the Trustee for not pleading a cause of action under 11 U.S.C. § 544, I do not find this critique relevant for two reasons. First, I do not believe the Judgment did create a lien on the proceeds of the Subject Properties. Second, even if the Judgment did create a lien, the Trustee should be accorded some flexibility in pleading, given the constantly shifting rationales espoused by Ms. Hartner's counsel.

Page 10 – OPINION

Leos argue that she may not, because they believe the Judgment has expired.

Before addressing the merits of the Fullard-Leos' argument, one point of clarification is necessary. When discussing the validity of the Judgment, the parties have generally cited *current* Oregon statutes concerning marital dissolution judgments. This ignores the fact that the Judgment was entered in 1992, when the statutory landscape was quite different. Accordingly, when analyzing applicable law, it is necessary to consider how that law has changed over time.

At the time the Judgment was entered, Oregon law specified that a judgment expired ten years after the date it was docketed.[14] ORS 18.360 (1991). Slightly less than a year after the Judgment was docketed (i.e., before it had expired), the Oregon Legislative Assembly amended the judgment statute. 1993 Or. Laws ch. 716 (Senate Bill 251). Among other changes, the 1993 amendment changed ORS 18.360 to provide that

> whenever a judgment under ORS 107.105(1)(f) provides for the future payment of money in gross or in installments and when the future gross payment or any installment does not become due for 10 or more years from the date of entry of the judgment, that part of the judgment and the lien thereof shall not expire until 10 years after the date on which the future gross payment or installment becomes due.

*Id.* § 1 (codified as ORS 18.360(2) (1993)). Then, as now, ORS 107.105(1)(f) refers to a property-division judgment entered in connection with a marital dissolution proceeding. The legislature made the 1993 amendment effective as to previously entered judgments that had not yet expired. *Id.* § 6. The provision of the MSA dealing with Debtor's ownership of the Corporate Entities "provides for the future payment of money" in connection with the division of marital property, and because it was incorporated into the Judgment, it is thus governed by the modified ten-year limitations period set forth in the 1993 law.

As with so many legislative matters, there is more to the story. In 2003, the Legislative

---

[14] Similar to current law, the 1991 statute allowed for renewal of a judgment prior to its expiration; however, Ms. Hartner concedes that she did not take the necessary steps to renew the Judgment.

Page 11 – OPINION

Assembly enacted a comprehensive revision of the state's judgment statutes. 2003 Or. Laws ch. 576 (House Bill 2646). The 2003 legislation repealed ORS 18.360 and reenacted it as ORS 18.180, where it remains today. *Id.* §§ 580 (repeal) and 18 (reenactment). Once again, the statutory changes were generally made applicable to preexisting judgments that had not yet expired. *Id.* § 45. Under the 2003 amendments, the modified ten-year limitations period formerly found in ORS 18.360(2) was recodified as ORS 18.180(7). Although the limitations period contained in the 2003 law is similar to the 1993 version, the legislature made important textual changes that impact Ms. Hartner's Judgment.

The 2003 law (as subsequently amended in ways that are not relevant to this case) is phrased as a conditional statement:

> If a money award in a judgment under ORS 107.105(1)(f) provides for a future payment of money, judgment remedies for the portion of the judgment providing for future payment expire 10 years after the date on which the future payment becomes due.

ORS 18.180(7)(a) (2015) (originally enacted as 2003 Or. Laws ch. 576 § 18). This phrasing is important because it means that the modified ten-year limitations period is only triggered if there is a "money award" in a property division judgment. There is a segment of the Judgment entitled "Money Judgment," but that segment exclusively concerns child support payments, and is thus not part of the property division under ORS 107.105(f)(1). Nevertheless, this court must examine the substance of the document, not mere labels; and that requires further consideration of what the legislature means when it refers to a "money award in a judgment under ORS 107.105(1)(f)."

The 2003 law defines the term "money award" to mean "a judgment or portion of a judgment that requires the payment of money." 2003 Or. Laws ch. 576 § 1(14) (codified as 18.005(14) (2003)). The question in this case is whether paragraph 9(a) of the MSA requires the payment of money. On the one hand, the MSA states Ms. Hartner "shall receive" half of the net proceeds if a sale or refinance occurs prior to the entry of a stipulated supplemental judgment. MSA ¶ 9(a)(iv). This provision could,

as Ms. Hartner urges, be construed as a contingent requirement that Debtor pay an unliquidated sum to Ms. Hartner. Under this construction, pargagraph 9(a)(iv) would constitute a money award.

On the other hand, the legislature defined a money award as part of a judgment that *requires* the payment of money. The common meaning of "require" is "to impose a compulsion or command upon (as a person) to do something" or to "enjoin, command, or authoritatively insist (that someone do something." *Webster's Third New Int'l Dictionary of the English Lang. Unabridged* (1971), at 1929. Typically the holder of a money award can compel or authoritatively insist on payment by employing post-judgment execution remedies such as writs of execution or garnishment. Not so in Ms. Hartner's case: while she was entitled to a payment under certain circumstances, the Judgment did not provide her with the ability to compel payment of the amounts related to the Subject Properties. The payment requirement was only triggered upon a sale or refinance, and the Corporate Entities were entirely in control of when—or if—a sale or refinance would occur. In addition, the amount of the supposed money award was not specified in the Judgment, nor could it have been, given that the parties had not yet reached agreement on the amount that was due to Ms. Hartner. Finally, the language of the payment requirement itself suggests that it is not a money award, since the provision applies only "if the parties have *not yet reduced [Debtor]'s obligation to a judgment*." MSA ¶ 9(a)(v) (emphasis added). If the MSA itself contained a money award vis-à-vis the Subject Properties, then Ms. Hartner would have already held a judgment, and the aforementioned language would be superfluous.

Thus, there are colorable arguments that the payment provision of paragraph 9(a) of the MSA does or does not constitute a money award for purposes of ORS 18.180(7)(a). This is a statutory ambiguity. *Tharp v. Psychiatric Security Review Board*, 338 Or. 413, 425-426 (2005) (when a statute lends itself to more than one plausible interpretation, it is ambiguous).

I conclude that the ambiguity can be resolved by looking to the context surrounding the statutory language. *See Portland Gen. Electric v. Bureau of Labor & Indus.*, 317 Or. 606, 610-611

(1993) (under Oregon law, when interpreting an ambiguous statute, courts must begin by considering the text and context of the statutory provision); *see also Midbrook Flowerbulbs Holland B.V. v. Holland Am. Bulb Farms, Inc.*, 874 F.3d 604, 614 (9th Cir. 2017) (when interpreting state law, in the absence of a controlling decision, federal courts must predict how state appellate courts would rule). Context includes other sections of a given legislative act. *Vsetecka v. Safeway Stores*, 337 Or. 502, 508, n.3 (2004). In the same 2003 bill in which the legislature enacted ORS 18.180, it also enacted ORS 18.038, setting forth the required form of a judgment document. The formatting statute specifies that a money award must be a separately labeled portion of the judgment, and must include "[t]he amount of the money award." 2003 Or. Laws ch. 576 §§ 5(1) and 5(2)(d). The point here is not so much that the Judgment was improperly formatted (after all, not complying with a yet-to-be-enacted procedural mandate can be excused), but rather that the legislature intended for a money award to be expressed as a definite amount of money. Here, although the MSA expresses an intent to compensate Ms. Hartner based on the value of the Corporate Entities, that compensation is not expressed as a sum certain, because the parties had yet to agree on the value of the underlying assets. As a result, the portion of the MSA that establishes Ms. Hartner's entitlement to compensation based on the Subject Properties is not a "money award" for purposes of Oregon's judgment statutes, and therefore the modified ten-year limitations period of ORS 18.180(7)(a) does not apply. Without the benefit of the modified limitations period, the relevant portions of the Judgment expired ten years after the date of entry, and thus Ms. Hartner can no longer rely on the Judgment to support the Claim.

    3.    <u>Does Ms. Hartner Have a Contract Claim Under the MSA</u>?

The MSA is a contract, and Ms. Hartner therefore argues that she can enforce her contractual rights even if the Judgment is expired. Ordinarily, this argument would not prevail because the contract would have merged into the judgment, and thus could not form the basis for a breach of contract claim. While Oregon courts historically endorsed this application of the merger doctrine in

the divorce context, the legislature has overridden this common-law rule in ORS 107.104(2), which provides that if a settlement agreement is incorporated into a dissolution judgment, a court may enforce the contract, the judgment, or any combination thereof. The Fullard-Leos nonetheless challenge the enforceability of the Claim, arguing that the MSA was breached many years ago, and Ms. Hartner failed to timely commence an action to enforce the contract.

In particular, the Fullard-Leos point to paragraph 9(a)(iv) of the MSA, which specifies that if Debtor "sells or refinances" the Subject Properties, Ms. Hartner "shall receive 50% of Husband's share of the net proceeds if the parties have not yet reduced Husband's obligation to a judgment." The Fullard-Leos allege that Debtor sold or refinanced both of the Subject Properties without paying Ms. Hartner her share of the proceeds as required.

The MSA does not define the term "refinance," but there is no evidence suggesting that the parties intended this word to mean anything other than its commonly accepted usage. *See Murray v. Laugsand*, 179 Or. App. 291, 247 (2002) ("Unless directed otherwise by an instrument, we give terms their common or ordinary meaning."). The verb "refinance" is generally accepted as referring to an "exchange of old debt for a new debt, as by negotiating a different interest rate or term or by repaying the existing loan with money acquired from a new loan." *Refinancing,* Black's Law Dict. (10th ed. 2014). The Fullard-Leos argue that there have been at least two refinancings, and at least one sale.

The alleged refinance transactions of the two Subject Properties occurred separately, so it is appropriate to measure each one as a separate breach of contract. *Pritchard v. Regence Bluecross Blueshield of Ore.*, 255 Or. App. 455, 460 (2009) ("[I]f independent acts cause independent injuries, each act is separately actionable, and the statute of limitations begins to run separately with each alleged breach."). With respect to the Franz Property, the Fullard-Leos have produced a warranty deed, recorded on May 5, 1998, transferring the Franz Property from Ashley's Inc. to El Nino LLC. Declaration of Kenneth Childs (ECF No. 376), Exh. C. That warranty deed was recorded

contemporaneously with a trust deed encumbering the Franz Property to secure repayment of a $1.45 million loan from AMRESCO Commercial Lending Corporation to El Nino. *Id.*, Exh. D. Debtor testified that these documents were executed at the request of AMRESCO, for purposes of obtaining a loan that was used for various purposes, including paying off the existing indebtedness on the Franz Property. Thus, there was both a sale and a refinance of the Franz Property on or about May 5, 1998, after which Debtor did not pay anything to Ms. Hartner. This constituted a breach of the MSA, and thus started the six-year limitations period under ORS 12.080. There is no discovery rule under Oregon's statute of limitations for contract claims. *Waxman v. Waxman & Assocs.*, 224 Or. App. 499, 453 (2008). Accordingly, because Ms. Hartner did not commence an action within six years from the date of the breach, she is now time-barred from asserting a claim under the MSA for a portion of the Franz Property proceeds.

Regarding the Ashley's Village Property, the Fullard-Leos point to a deed of trust, recorded July 15, 2003, securing repayment of a $935,000 loan. Childs Decl., Exh. H. Debtor testified that Can-American, Inc. obtained this loan to refinance existing debt encumbering the property. Thus, there was a refinance of the Ashley's Village Property on or about July 15, 2003, after which Debtor again failed to pay any proceeds to Ms. Hartner. Once again, this constitutes a breach of the MSA, and Ms. Hartner did not bring an action within the six-year limitations period.

Given the evidence produced by the Fullard-Leos, I agree that Debtor breached the MSA more than six years before the petition date, and that Ms. Hartner did not timely pursue a claim. As a result, the Claim is barred under Oregon's statute of limitations. Although a creditor may file a bankruptcy claim based on a time-barred debt, the trustee or another party in interest may successfully raise the statute of limitations as an affirmative defense against such claim. *Midland Funding v. Johnson*, 137 S.Ct. 1407, 1412 (2017). Here, the Fullard-Leos have lodged a procedurally proper objection to the

Claim, and I find that the underlying debt is unenforceable under applicable non-bankruptcy law. Accordingly, the Fullard-Leo's objection is sustained pursuant to § 502(b)(1) of the Bankruptcy Code.

IV. Conclusion

Because the Judgment has expired, Ms. Hartner's only ability to assert a claim against the proceeds from the Trustee's sale of the Subject Properties is based on her contract remedies under the MSA. Because Debtor breached the MSA prepetition and Ms. Hartner did not timely bring a claim under the MSA, her Claim is now time-barred and is therefore disallowed. Within fourteen days of the date of this opinion, Counsel for the Fullard-Leos should submit an order sustaining their objection to the Claim. The court will enter an order dismissing the Trustee's adversary complaint as moot.

###

cc:  Brad T. Summers
     Douglas R. Ricks
     Kenneth P. Childs